Today on Oral Argument, beginning with United States v. Robles-Avalos, Mr. Castillo. May it please the Court, Damian Castillo here on behalf of Ismael Guevara-Lopez, the appellant in this case. Your Honor, does this case present the issue of whether Agent McLean of the U.S. Border Patrol had reasonable suspicion to conduct the stop he conducted of the appellants in this case? The Court looks at the totality of the circumstances, analyzing certain factors under a Brigoni-Ponce and Supreme Court precedent, and the paramount factor is the proximity to the border. That's sort of where this case begins. This is a case where the stop, it's undisputed, occurred more than 50 miles from the U.S.-Mexico border. Well, that's by road, not as the crow flies. As the crow flies, it was about 25 miles? I believe that was the testimony of the agent. However, he did concede that he did not believe in the end that this vehicle came from either a checkpoint or from the U.S.-Mexico border at any point. There was also testimony to the effect that he, at the point the vehicle was stopped by road, the closest checkpoint was about 100 miles away from where the vehicle was stopped. This occurred, as a context, this occurred on Highway 90, a highway in Texas, and it connects to a farm-to-market road, Farm-to-Market Road 505, which became at issue in this case. What's important here is Highway 90, of course it's a public road, not a private road, not a road with a checkpoint on it, not a direct route to the U.S.-Mexico border. The agent did state that he, this road has been known for drug trafficking in the past. However, when pressed on that issue, he admitted that almost any road in Texas that inevitably leads to the border, they would consider a road that's been used for drug trafficking in the past. This Farm-to-Market Road, again, it's not a private road, not any type of ranch road, not a road with a checkpoint. These aren't roads that are parallel to a checkpoint. And so this Farm-to-Market Road that was used, although the agent stated that it was a road rarely used, it was a road that led to a scenic loop, which was a scenic loop 166, that led you to another route. What's important here in this context is that this vehicle, and this came up later on in his testimony, was registered out of Odessa, Texas. And it was registered to a female. Now that was all consistent with the facts that were before the case. And the district court, in one of its findings, found that the shortest route to Odessa, Texas, from where this vehicle was, was the route, in fact, that the vehicle took. The agent initially stated that she could have taken the different route by taking Highway 90 all the way to I-10 and then on her way to Odessa. However, again, for mileage purposes, if she would continue on FM 505 to 166 and then to Highway 118, that would have taken her to I-10 sort of at an angle. Now all that, again, we're going to the proximity of the border. The paramount factor weighs against the government if we take the agent's testimony about he did not believe this vehicle arose from the U.S.-Mexico border. However, you have other issues, and I understand we're dealing with the experience of the agent, and we'll take that on. He testified he had eight years of experience, and most of them dealt with this area west of Marfa, Texas. I think what's important here, though, is that his testimony was that he spent a lot of his time in this farm-to-market road, 505, and he pretty much stopped anybody who was from outside the area. It's sort of like he created a de facto checkpoint. Now this is distinguishable from other cases where the court has found suspicion in private ranch roads or other farm-to-market roads because in most of those cases the roads were parallel to a checkpoint, to either a highway that contained a checkpoint, and so individuals were trying to avoid the checkpoint road. This isn't the case here. Neither Highway 90 nor farm-to-market road 505 contained any such checkpoint. Was the roadside park on 90 or 505? The roadside park, Your Honor, was on 505. And that roadside park, of course, there was testimony there that this is where the vehicle initially stopped. When it stopped there, the agent, and I think this is in his testimony, didn't stop to fully observe, passed by, slowed down, did illuminate his headlight, glanced, and this is when he first noticed the female in the vehicle or outside the vehicle. This is going to this factor of the observations of the driver and whether there was passengers in this vehicle. I think this also weighs against the government because this was the first point where the agent was able to get a clear observation of the driver. However, it was only for seconds. His testimony was that it lasted for seconds. He used the word glanced. It was simply a glance of the driver and the vehicle. And by the time he reached the roadside park, as this Court recalls, he was about a quarter of a mile to half a mile behind this vehicle, and it was pitch dark, so he couldn't see inside the vehicle the entire time. By the time he reaches this roadside park, the driver is already outside the vehicle. He testified that he did not witness any other person exit the vehicle or whether any other person had exited the vehicle. Later on, when he positions himself on this Farm to Market Road 505, then the vehicle turns on that road. That's the first time he observes this vehicle going, and then he gets his observations of the other passengers. We believe that in that context, considering that this is a case where the proximity to the border weighs against the government and taking into account all these other factors consistent with the driver heading to Odessa where this vehicle is registered, we believe there was not reasonable suspicion to conduct this stop. Thank you, Mr. Castillo. You've saved time. No, you have not saved a lot of time. Thank you. Ms. Kimmelman. May it please the Court, Kristen Kimmelman for Jorge Robles Avalos. Mr. Robles also asked the Court to vacate his drug trafficking conviction because it is based on evidence that the District Court should have suppressed after the suppression hearing. As my colleague Mr. Castillo was explaining, this area in West Texas involved paved roads, public roads, not a private dusty road as we see in some of the cases, and these roads have innocent, legitimate traffic going on them. Nevertheless, Agent McClain testified that his practice was to stop pretty much any vehicle on those roads because it's a suspicious place to be at night. Your Honor asked about the Ryan Roadside Park. It's actually on Highway 90, which goes from Marfa to Van Horn, and that's when Agent McClain first encountered the Chevrolet 300. He had just gotten on the road a little after midnight and came across that vehicle, was trailing it by a quarter or a half mile, and sees the driver going slowly. She was already driving slowly. Thank you, ma'am, Chrysler 300, now that it really matters. Sorry, Chrysler 300. And he thought that this meant that she was looking for a place to pull over perhaps, and in fact that's what she did. She pulled into the Ryan Roadside Park, which is a designated area where innocent travelers could stop to stretch their legs, reorient themselves, et cetera, relieve themselves even. And he, as Mr. Castillo said, didn't see her park, didn't see her get out, and didn't see whether other people had exited the vehicle. By the time he drove by, she was already standing outside of the vehicle facing the highway. He shined his alley light for a few seconds, just a glance, and didn't see any other people there. And he continued on. He didn't even call his fellow Border Patrol agents to say that this vehicle had stopped in the roadside park. He didn't try to circle back to an observer. Instead, he went on the 505 to what sounds like his normal sitting spot, his de facto checkpoint on that road before Highway 166, where he positioned himself with his headlights on facing the highway so that he could see the traffic as it comes by. So a little bit later, maybe 15, 30 minutes later, he saw the Chrysler's headlights turn onto 505. She presumably could have seen his headlights. It's the desert, and he has this vision. And she travels on that 505 road to the other highway. And when he sees the vehicle pass him there, he again gets a little bit of a look inside of the vehicle, and he testifies that he sees three people in the front seat and multiple passengers in the back. This apparently aroused his suspicion, and he followed her at that point to then run her tags and see where the vehicle was registered to. During that time when he's following her, no erratic driving behavior. There's none of the swerving that sometimes agents testify to suggest that they are nervous about being followed by a Border Patrol agent. His vehicle is a marked one, so presumably she knows at that point that she's being followed by Border Patrol. And when the registration comes back to Odessa, he says, okay, this is an out-of-county car, and Odessa is a destination for smuggling, for alien trafficking, and for drugs as well. But as this court has stated, any large city with a population and workforce is going to be a destination for immigrants seeking to come into this country and work or disappear into the shadows. And ultimately, it's a Texas vehicle driving on Texas roads, going in the direction that makes sense to get home. Not that, by the way, in the United States of America, we need to always be driving back to where our car is registered from. And so the district court actually makes an error in its ultimate findings on this issue because the magistrate court found that it was a direct route. But in the district court's findings, the district court, even though it adopted the magistrate court's findings, says that it was an indirect route, it wasn't the most direct route to get to Odessa. This was suspicious. The district court also relied on the fact that Odessa, according to Agent McLean, was a smuggling hub. And the district court relied on this inference that the passengers increased from the time that the agent saw the vehicle at the Ryan Roadside Park to when he saw it on 505. The district court adopts another error from the magistrate court's ruling, which is that Agent McLean saw three passengers sitting in one front bucket seat. Agent McLean knew the Chrysler 300 had two bucket seats and a console, and he testified that there were three people in the front seat. So while that may still be a strange sitting arrangement, it's not as strange as having three people piled into one bucket seat, which is what the magistrate court found. And so these errors, factual errors, accumulate also to the ultimate conclusion that the legal finding of there being reasonable suspicion based on articulable facts wasn't supported. And, of course, as Mr. Castillo was explaining, these roads not only go to ultimately Interstate 10, which is a large major thoroughfare, they pass ranches, they pass an observatory, which is not an abnormal place to go at night. And there, of course, are local ranchers who have guests that come and visit them. Agent McLean said at first that, no, he didn't stop everybody, that he knows the locals, that he only stops out-of-county vehicles that are not ranch pickups. But then he later testified that he has stopped locals driving on those roads, and that he couldn't put a number on it, so many that he can't even count. All we know is that it's some less than 50. In his eight years, McLean had been involved in over 100 arrests. So if you take those numbers, it's about a third of the time Agent McLean is out there on these dark roads stopping innocent travelers who are coming back from an evening in El Paso. And so this is the type of situation that is not supported by Brignone-Upon-Sea and that the Fourth Amendment exclusionary rule is meant to provide some guidance to the officers and prevent this unlawful police conduct. And I concede the rest of my time if there are no questions. Yes, you saved time for rebuttal. Thank you, Mr. Kimmelman. Mr. Gay. Good morning. May it please the Court. Joseph Gay from the United States Attorney's Office from the Western District of Texas. I'd like to begin by inviting this Court to read the transcript of the suppression in this case, and I would urge this Court to consider the agent's testimony as not in any way establishing that he has a de facto checkpoint set up in this area. His testimony is very clear. He has worked that exact area for over eight years, his entire career. He is familiar with every ranch owner on that particular stretch of road and is familiar with the vehicles that they drive. He does specifically state that on the night in question, there were zero cars on the road besides this car. This begins at a roadside park on Highway 90 where there's an aerostat balloon. The aerostat balloon is a beacon that smugglers use to track their way 25 miles from the river to the highway so that they can basically be picked up. He's leaving Marfa, driving down Highway 90, and he sees some taillights up ahead. He follows behind. He notices some erratic tapping of the brakes, keeps driving, stays behind. He sees the vehicle stopped at this roadside park. There is a woman standing outside the vehicle who is staring off into the distance. Mind you, this is after midnight in a very desolate area. Maybe she's looking for the Marfa lights. Could be, Your Honor. I'm just teasing. This was on the other side of Marfa from the lights, I think. Yeah, I think it is actually on the other side. Specifically, as to what he saw when he drove by, I think it's important to recharacterize. He's asked, now, you didn't shine your alley light at that point, correct? He says, as I passed. They said, you did? Yes. And you shined that into her car. It lit the whole everything up. And he states specifically, all I saw was her. Now, the vehicle then, he continues on his way and sets up down the road. He encounters that same vehicle about 30 minutes later, and it's crammed with people. These are articulable facts that distinguish this case from all the other cases where they argue this is completely innocent behavior. If we go back to Terry and the Supreme Court's opinion in Arizoo, this is not a divide-and-conquer analysis. This is a totality-of-the-circumstances analysis. And as the Supreme Court stated, this isn't probable cause. This is reasonable suspicion, which is something considerably less than a preponderance of the evidence, even. Here, when you look at the totality of the circumstances, in the exact area in the preceding two weeks, he had made three arrests, two for drug smuggling, one alien smuggling. The area is well-known in this Court's cases as being a very hot area. It's desolate. In fact, he has patrolled this area and understands the traffic patterns. And although the proximity to the border analysis is, in this case, somewhat less relevant because, essentially, it's a backpacker case,  it's part of the nature and characteristics of the area. And so while the case law says we view the other factors more cheerily, the district court was not incorrect in giving the proximity, the fact that as the crow flies about 25 miles, give or take, that this area is close to the border in an area well-known for smuggling. In this case, within the last two weeks, there had been significant activity in the area. He sees a vehicle, and by the way, he testifies, I rarely, if ever, see a sedan on this road. He says, I know all of the ranchers and their vehicles. And he essentially says, I've never seen a car. I've only seen trucks and SUVs. So he sees the Chrysler 300, which is undisputed, has two bucket seats, pass him, and it's now laden with people. He then follows, runs the license plate, registered out of Odessa. Let me be sure that I understand what you're saying. You're suggesting that we review the record. We'll certainly do that. But he testified that on U.S. 90 that he seldom sees a sedan? No, as he turns on to 505 in that route off of Highway 90. All right. At midnight. Because 90 would certainly have lots of sedans. Exactly. All right. Yes, it's the area. And by the way, that is a scenic route. And when the district court finds that it's not a direct route, that is far at night for everybody who's been out there. It's a treacherous drive. It is not the usual route, most people. And we can quibble about whether it's the most direct route or the most convenient route. But he testifies that there is virtually no other traffic on this road. Tourists take that road during the day to get up to the McDonald Observatory and all that sort of thing. But in the dark of night, there is nothing out there. It is a long stretch of nothingness. In fact, he specifically states, zero other cars. So when you look at his experience and training, the characteristics of the area, the proximity, which is part of those characteristics, the actual things he observed, where we have a car stopped in an area known for alien smuggling, the car doesn't have, he cannot see any other people besides the driver, and that exact same car shows up with, basically stuffed with people, three people in the front seat. That means one person is sitting in the console or two are sitting in one seat next to the driver, and the back is full. All of these things are an articulable basis to believe that criminal activity is afoot. Not certainty. And certainty is not required. If we go back to Terry, we've got Officer McFadden pacing up and down in downtown Cleveland, and he sees a group of individuals walk past a jewelry store several times. It's innocent behavior, but except Officer McFadden, he knows they're getting ready to rob the jewelry store. The experience and training of the officer, or the agent in this case, is very significant. He knows the area, he's patrolled this area, and he exercises his discretion. In this case, based on articulable facts, this is what reasonable suspicion requires. If there are no further questions, I'll yield back my time. Ms. Cameron, you've saved time for rebuttal. Like opposing counsel, I invite the court to review the transcript because I think it shows a different version of the facts than what necessarily may be taken from what opposing counsel described. For instance, Agent McClain does testify that he knows the locals, he knows approximately their vehicles, but yet he is still testifying that he stops them so regularly that he can't count them. And certainly he didn't see any other traffic on that road that night because this was the first car that he saw. He stopped the first car that he saw on 505, and that is consistent with what he testified as his practice on that farm road. What do you do with the fact that he saw only the one person outside of the car the first time and then the car crammed with multiple passengers a few minutes later? I challenge whether that inference, that whether the car was devoid of any other people, co-counsel read, all I saw was her, sir. That was the answer to the question, can you say for certain she didn't have any passengers? And he didn't say, yes, I can say for certain. He said, all I saw was her. And this was in the seconds that he drove past with his alley light shining. And the testimony isn't very clear of how much was illuminated, how she was positioned, how well he could actually see inside of that car. He had participated in those three arrests in the two preceding weeks, but there wasn't any testimony about the details of those arrests other than that they were near the Aerostat balloon. We don't know if they involved backpackers. We don't know if they were getting into vehicles. We don't know if they were at midnight. And we don't know if they were on Highway 90 or on 505. He also testified that typically trafficking organizations change their method of operations and their pattern once they start getting apprehended. I would think getting apprehended three times in the last two weeks might be a signal you need to change how you're doing things. But Agent McLean still was there, and that recent experience was not anything like a be-on-the-lookout intelligence that there were actually backpackers in the area that night. There were lots of references to Terry, but I would encourage the court to also look at the actual cases involving border patrol roving stops that the Supreme Court has heard. And those facts are very distinguishable from what we have here. In Arvizu, there's a dusty, primitive road that sensors were alerted to and that made the agents go out and investigate. There was erratic driving. There was taking turns that that vehicle was not equipped to handle in what looked like an attempt to avoid inspection. And that was reasonable suspicion. But as you know, there have been a lot of stops just west of Odessa on I-20, which is an interstate, and those were in broad daylight, and we've upheld many of them. We've reversed on some. Right, and on the ones that have been upheld, there is observation of the passengers typically, observations of erratic driving by the vehicle, and those factors are missing. Yes, we saw several people in the vehicle on 505, but he didn't see what they looked like. Did they look like they had been walking for the approximate four days Agent McLean said it would take to traverse that mountainous terrain over to where Highway 90 is. He didn't see. All he could see was that the driver was the woman, and the driver's behavior of going slowly and tapping the brakes and pulling over to that roadside park was consistent with an innocent traveler being lost in the middle of the night. Or it's what lots of us would do if we thought there was a law enforcement vehicle behind us. We'd be sure that we had slowed down to be below the speed limit, wouldn't we? Some people might. That was a friendly question. Right, but there wasn't proof that she even knew, could tell in the darkness of night who was following her a quarter mile, half a mile back. So we would ask that the court vacate Mr. Robles' and Mr. Guevara's sentences. All right, thank you, Ms. Kimlin. Your case is under submission. Thank you. Mr. Castillo, we notice it's your court appointing. We wish to thank you for your willingness to take the appointment and for your good work on behalf of your client. Thank you, Your Honor. Next case, Petrobras.